**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Edwin E. WIEGAND,**
**Defendant/Appellant.**

**No. 86–5213.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 3, 1987.

Decided March 18, 1987.

Judith S. Feigin, San Diego, Cal., for plaintiff-appellee.

Thomas F. Homann, San Diego, Cal., for defendant-appellant.

Before SNEED, FARRIS and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Edwin Emil Wiegand of Oceanside, California appeals his conviction under 18 U.S.C. §§ 2251 and 2252 of the sexual exploitation of children and his conviction under 18 U.S.C. § 371 of conspiracy to exploit children. His offense was to pose two girls, one aged 17, one aged 10, for photographs focused on their genitalia. He challenges both the warrant which led to the material that resulted in his conviction and the meaning of "lascivious" as used in the statute and interpreted by the district court.

On December 7, 1985 George A. Runkle, Jr., a special agent of the Federal Bureau of Investigation assigned to the San Diego division, filed an affidavit before Magistrate Irma E. Gonzalez setting out the following:

A reliable confidential informant had told him that in April 1983 he had visited Wiegand's residence and viewed films of children as young as 9 or 10 years of age engaged in sexual intercourse with adults; the informant told him that one Steven Michael Lang, an associate of Wiegand, had said to him on October 15, 1985 that he, Lang, had recently seen "Mr. Ed's kiddie porn films;" Lang, who had accompanied the informant on his visit to Wiegand in 1983, had also told the informant of photographing naked young females in Europe and sending their pictures to Wiegand from Europe in the summer of 1984; Richard Ruddiman, a cab company employee and friend of Wiegand, had told Runkle that Lang had informed Ruddiman about seeing a "beauty pageant" of naked children at Wiegand's place on October 12, 1985, and on October 13, Wiegand had expressed concern to Ruddiman that a former associate of Wiegand's had been recently arrested on child pornography charges and might inform the police about his association with Wiegand; Ruddiman told Runkle that on December 2, 1985 he had watched a pornographic video at Wiegand's showing the activities of a girl of 10 to 12 years old; on October 26, 1985 Ruddiman, who was cooperating with the FBI, wore a body recorder during conversation with Wiegand at Black's Beach, La Jolla, and, in the conversation recorded, Wiegand described one of his films as showing "a very cute 12 or 13 year old girl" undergoing sexual intercourse; in the same recorded conversation Wiegand went on to say that some of the children in his films were only 9 or 10 years old and one was a girl of 5 years of age.

On the basis of this information, Special Agent Runkle deposed that he had reason to believe that at Wiegand's mobile home in a mobile home park in Oceanside there were "films, photographs, video tapes, negatives or slides, depicting a person under the age of 18 years of age engaged in an act of sexual conduct," which he then specified in greater detail. On the basis of this affidavit, Magistrate Gonzalez issued the warrant for the property described by Runkle as being in violation of 18 U.S.C. §§ 1462, 2251, and 2252.

Wiegand maintains that there was no probable cause for the warrant to issue. He puts heavy emphasis on the statement by Agent Runkle made to him at the time of the search that he "felt that there was no probable cause to believe that a federal crime had been committed." He goes on to argue that nothing in the affidavit indicated that Wiegand himself had produced any child pornography in violation of 18 U.S.C. § 2251, which requires that the photographer have reason to know his films will be mailed, or that he had received in the mail or in interstate or foreign commerce any child pornography in violation of 18 U.S.C. § 2252, or that he had violated 18 U.S.C. § 1462, which prohibits taking obscene material from a common carrier.

The standard by which the sufficiency of a warrant is measured for searching for photographs is the same standard as that used in justifying a warrant for other

forms of contraband. *New York v. P.J. Video, Inc.,* ––– U.S. –––, 106 S.Ct. 1610, 1615, 89 L.Ed.2d 871 (1986). It is the standard set by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The magistrate must make "a practical, commonsense decision whether, given all the circumstances set forth in the affidavit," there is a fair probability that evidence of a crime will be found in a particular place. 462 U.S. at 238, 103 S.Ct. at 2332.

■ Magistrate Gonzalez made such a practical common sense decision. She had abundant reason to believe that Wiegand was in the possession of material in violation of 18 U.S.C. § 2251 or § 2252. She could not, of course, be certain that he had received it in interstate commerce or through the mail or that he intended to develop his film by mailing it, but there was certainly a fair probability that any film he had or had made had been developed outside his trailer and had been mailed back to him. The affidavit vividly conveyed an impression of a devotee of child pornography likely enough to seek a supply through the mails and likely enough to want professional development of any films he himself might make. Magistrate Gonzalez did not have to be certain of his guilt. She only had to think that there was enough in Agent Runkle's affidavit to justify her conclusion that there was a fair probability of finding evidence.

■ Wiegand presses his critique of the warrant, contending that it does not "meet the exacting standards required when the power of search and seizure is used as an instrument to suppress material presumptively protected by the First Amendment." His critique is bolstered by a decision of another circuit holding that a similar warrant violated the Fourth Amendment and that material obtained pursuant to it must be suppressed. *United States v. Diamond,* 808 F.2d 922 (1st Cir.1987) (2–1 decision per Coffin, J., Campbell, C.J., dissenting). In *Diamond* the court reasoned that the officers making the search would not have a basis for distinguishing film depicting "young-looking adults" from film depicting children. As sexually explicit nobscene films of adults fall within the protection of the First Amendment, and as the search took place within the sacred precincts of the home, the court held that the Fourth Amendment "would not tolerate" the warrant, which could have resulted "in the mistaken seizure of constitutionally protected materials of no evidentiary value in a criminal prosecution from a private home." *Id.*

Precedent in this circuit is to the contrary. *United States v. Hurt,* 795 F.2d 765, 772 (9th Cir.1986); cf. *United States v. Smith,* 795 F.2d 841, 848 (9th Cir.1986). *United States v. Hale,* 784 F.2d 1465 (9th Cir.1986) is not an exception: the seizure there held constitutionally impermissible was not pursuant to a warrant drawing the line at age and authorizing the seizure of material showing minors in explicit sexual acts. Acknowledging the force of the First Circuit's reasoning, we are bound by more than precedent: we believe that *Hart* has struck the right balance.

The Fourth Amendment asserts the right of the people to be secure from "unreasonable searches and seizures" and requires that no warrant issue but upon probable cause "and particularly describing the place to be searched, and the persons or things to be seized." What is an unreasonable search turns on a consideration of all the circumstances. What is particularity depends on the nature of the thing to be seized.

■ Making clear that probable cause for seizing film·is not different from probable cause in other searches, the Supreme Court has reaffirmed that the seizure of materials "presumptively protected by the First Amendment" must be supported by affidavits "setting forth specific facts." *New York v. P.J. Video,* ––– U.S. –––, 106 S.Ct. 1610, 1614, 89 L.Ed.2d 871. As the Court then quoted *Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961), the purpose of this requirement is that the issuing magistrate may "focus searchingly on the question of obscenity." Child pornography is *not* presumptively protected by the First Amendment; it is almost completely outside its

protection. *New York v. Ferber,* 458 U.S. 747, 763, 102 S.Ct. 3348, 3357, 73 L.Ed.2d 1113 (1982). When film is described in the graphic terms of the statute on the sexual exploitation of children the film is described with all the particularity necessary to satisfy the Fourth Amendment. So in this case Magistrate Gonzalez was able on the basis of Agent Runkle's affidavit to "focus searchingly" on the question of whether the materials he described fell within the statutory description. Little was left to the imagination, and nothing to the discretion, of the searchers as to what they were to look for and carry off. They were restricted to film depicting explicit acts of sexual conduct—explicitly described in the warrant—by children under the age of 18.

Judge Coffin in *Diamond* reasoned that the searchers might seize constitutionally-protected adult pornography. Common sense suggests that most of the time one can tell the difference between a child and an adult. Of course, there are persons under 18 who look over 18 and vice versa, but the ability to distinguish is the basis on which criminal liability accrues under the statute: no one has contended that Wiegand should be acquitted because one of his subjects might pass for over 18. The predicate of many statutory rape laws is that the actor must at his peril be able to tell the difference in age of the victim. If such laws are not unconstitutional because a mistake as to age might be made, it is difficult to hold a warrant unconstitutional because error could occur under its direction. That apparently in child pornography films some adults play the part of children does not materially alter the case: to seize the pornographic picture of an adult who is acting the part of a child is not an unreasonable seizure.

■ The statute makes criminal only the production of child-exploitative films, or their receipt, in relation to the mails or commerce subject to federal law. The statute does not criminalize mere possession. Was the warrant overly broad in failing to distinguish between material violative of the statute and material legally obtained in some other way unconstitutionally broad? *Ferber* established that child pornography was "a category of material outside the protection of the First Amendment." *Id.* at 763, 102 S.Ct. at 3358. No intrusion on a First Amendment right would occur if legally-possessed child pornography were seized along with criminal contraband. The remedy for the wrong would be return of the legal material not suppression of the evidence.

■ It was conceded in *Ferber* that there might be "a tiny fraction" of pictures portraying the sexual acts of children that might fall within the First Amendment's range. *Ferber* at 773, 102 S.Ct. at 3363. Not for that reason was a statute unconstitutional which criminalized the presentation of such pictures. Analogously, a warrant to search for film portraying the sexual exploitation of children is not defective because the possibility exists that a tiny fraction of the material seized might be found to fall within the exception acknowledged by *Ferber.* In the protection of children otherwise privileged expressions may be affected. *FCC v. Pacifica Foundation,* 438 U.S. 726, 749, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978).

■ Wiegand has a final objection to the warrant: it departed from the statutory language in describing the film sought as inter alia depicting children in "exhibition of the genitals for the purpose of sexual stimulation of the viewer." The statutory language is "lascivious exhibition of the genitals." The warrant was slightly more specific than the statute. No injury was done Wiegand by its greater specificity.

■ Wiegand, however, contends that the statutory term "lascivious" is itself unconstitutionally vague as used in the indictment and as interpreted by the district judge. "Lascivious" is no different in its meaning than "lewd," a commonsensical term whose constitutionality was specifically upheld in *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), and in *Ferber* 458 U.S. at 765, 102 S.Ct. at 3359.

The district court in its oral decision declared that it understood "lascivious" and "lewd" to be "virtually interchangeable." Applying this definition to the pictures before it, the court analyzed those of a naked 17–year-old girl taken in a series of poses displaying her pubic area. The court found that some of the pictures depicted "a willingness to engage in sexual activity" and that some showed the girl "in a position that suggests sexual activity." The court then considered a single picture of a naked 10–year-old girl. It found the picture depicting neither sexual willingness nor sexual activity, aptly adding that "it would be almost incredible" that a child of these years would register sexual coyness. But the picture it found to be lewd in its "unnatural" focus on the girl's genitalia.

In its written decision, 636 F.Supp. 828, 832 (S.D.Cal.1986) the district court cited *United States v. Nemuras,* 567 F.Supp. 87 (D.Md.1983), *aff'd,* 740 F.2d 286 (4th Cir. 1984), a case treating "lewd" and "lascivious" as interchangeable. The district court then enumerated six factors it considered in determining whether there had been depiction of lascivious exhibitions, beginning with "the focal point" of the depictions—the genitalia of the girls. The court used the terms "unnatural" and "unusual" to describe the 10 year old girl's pose in the picture.

Wiegand challenges the district court's interpretation of "lascivious." He claims that the court employed an "essentially subjective test." He rings changes on the meaning of "lascivious." His challenge is equally applicable to the term "lewd." It is a challenge reciting the obvious, that these terms are not independent of a social, cultural, and moral context. The same observation of course is true of "reasonable" as it has been read into the Sherman Act. Normative terms incarnate norms. Norms do vary over time and place. The law's embodiment in the contemporary customs and conventions of a community is not a constitutional infirmity.

■ Wiegand asks this court to make its own independent determination of whether or not the pictures are lascivious. The question of whether the pictures fall within the statutory definition is a question of fact as to which we must uphold the district court's findings unless clearly erroneous. Cf. *United States v. Merrill,* 746 F.2d 458, 463 (9th Cir.1984), *cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985). The definition of "lascivious" is a matter of law which we review *de novo.* Necessarily in deciding whether the district court erred as to the facts, we must view the pictures ourselves and must interpret the statutory term. Doing so, we conclude that there was no error either as to fact or law.

■ The standard employed by the district court was over-generous to the defendant in implying as to the 17–year-old girl that the pictures would not be lascivious unless they showed sexual activity or willingness to engage in it. The offense defined by the statute is depiction of a "lascivious exhibition of the genitals." Plainly the pictures were an exhibition. The exhibition was of the genitals. It was a lascivious exhibition because the photographer arrayed it to suit his peculiar lust. Each of the pictures featured the child photographed as a sexual object.

The district court noted the unlikelihood of the 10–year-old girl intending any sexual invitation by her pose. "Lascivious" does have such a connotation when applied to the conduct of adults. In the context of the statute applied to the conduct of children, lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles. The district court noted that the pose of the 10–year-old was "unnatural." This adjective does not reflect an incorrect reading of the statute although the term goes beyond what is necessary to find the picture within the statutory definition. The picture of a child "engaged in sexually explicit conduct" within the meaning of 18 U.S.C. §§ 2251 and 2252 as defined by § 2255(2)(E) is a picture of a child's sex organs displayed lasciviously—that is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.

The crime punished by the statutes against the sexual exploitation of children, however, does not consist in the cravings of the person posing the child or in the cravings of his audience. Private fantasies are not within the statute's ambit. The crime is the offense against the child—the harm "to the physiological, emotional, and mental health" of the child, *Ferber* 458 U.S. at 758, 102 S.Ct. at 3355; the "psychological harm," *id.* at 775, 102 S.Ct. at 3364 (O'Conner, J., concurring); the invasion of the child's "vulnerability." *Id.* at 776, 102 S.Ct. at 3364 (Brennan, J., concurring). These harms collectively are the consequential damages that flow from the trespass against the dignity of the child.

Any photograph makes its human subject an object. No offense to human dignity is done. The pornographic photographer subordinates the humanity of his subject to the sexuality of the subject. The humanity of the subject is not eliminated; how could it be? Indeed the interest of the pornographer is in the human person treated as sexual object. From a feminist perspective, this reduction of humanness has been seen as a male offense. *See, e.g.,* A. Garry, "Pornography and Respect for Women" in D. Copp and S. Wendell, *Pornography and Censorship* (1983) 73. But whether the person is male or female, the essential operation is the same: an assault upon the humanity of the person pictured, making that person a mere means serving the voyeur's purposes. It is because of this reduction that a writer celebrated for his victory over censorship can write:

> But even I would censor genuine pornography, rigorously. It would not be very difficult. In the first place, genuine pornography is almost always underworld, it doesn't come into the open. In the second, you can recognize it by the insult it offers, invariably, to sex, and to the human spirit.

D.H. Lawrence, *Phoenix* (1936) 175.

Human dignity is offended by the pornographer. American law does not protect all human dignity; legally, an adult can consent to its diminishment. When a child is made the target of the pornographer-photographer, the statute will not suffer the insult to the human spirit, that the child should be treated as a thing.

AFFIRMED.